This bill was filed by the plaintiff, as the surviving executor of the will of Yancy Holman, praying the opinion and direction of the Court, as to certain bequest in the said will.
The following clauses are set forth in the plaintiff's bill as those that require consideration in the questions propounded to the Court viz:
Item 2. I give and bequeath to Henry Newby, who married my daughter Nancy Holman, the sum of one dollar, and no more.
Item 3. I give and bequeath to Daniel Bryant, who married my daughter Susannah Holman, the sum of one dollar, and no more.
Item 4. I give and bequeath to Alexander Russell, who married my daughter Elizabeth Holman, one dollar and no more.
Item 5. I give and bequeath to the widow of my son Yancy Holman, one dollar and nothing more.
Item 6. I give and bequeath to my son Thornton Holman, the following negro slaves, to wit, Sylvia, and her four children, by name, Calvin, Bill, Alfred and Joshua, together with her future (379) increase; also one negro boy that I loaned him some years since, by the name of Henry, to him and his heirs absolutely forever.
Item 7. I give and bequeath to my son Archer Holman, the following negro slaves to wit, Lucy, and her four children, by name, Missouri, Jinny, Norman and Cicero, together with her future increase; also one negro boy, that I loaned him some years since, by the name of Jordan, to him and his heirs absolutely forever.
Item 8. I loan to my daughter Sarah, wife of Thomas Carter, the following named negro slaves, that is, Peter, and his wife Mary, and their four children, viz., Ruth, Isabel, Frances and Elizabeth, and their increase; and at the death of the said Sarah Carter, then, the aforesaid slaves, with their increase, descended to the bodily heirs of the said Sarah Carter, to be equally divided between them, share and share alike, to them and their heirs forever.
Item 9. I loan to my daughter Catharine, wife of William King, the following named negro slaves, viz., Pleasant, Bartlet, John, Violet, Charlotte and Martha, and their increase; and at the death of the said Catharine King, then the aforesaid slaves descends to the bodily heirs of the said Catharine King, to be equally divided between them, share and share alike, to them and their heirs absolutely forever.
Item 10. It is my will and desire that the following negro slaves to wit, Anderson, Isaac, Juliet, Perry, Friday, Larina and Elva, shall *Page 315 
be hired out in this section of the country by my executors, hereinafter named, for the benefit and use of the children of my daughter Elizabeth Russell, who married Alexander Russell, until the youngest of the said children shall arrive at the age of twenty-two years; and that my said grand-children shall and may receive, from time to time, the proceeds of the hire of the said slaves, as it may fall due and come into the hands of my said executors, and by them forwarded to the clerk's office of Lauderdale County, Alabama; and by the County Court of said County, to be distributed equally between all the children of the said Elizabeth Russell, according to the discretion of the said Court, for the purpose of their better maintenance and education; (380) and when the youngest of my said grand-children shall arrive to the age of twenty-two years, then it is my will and desire that the said slaves shall be equally divided between all my said grandchildren, share and share alike, to them and their heirs absolutely forever.
Item 11. It is my will and desire that the slave Harriet, and her child Cina, be sold, as it is her request, to the highest bidder.
Item 12. It is my will and desire that my tract of land lying and being in the County of Rockingham, on the water of Little Rockhouse Creek, containing 346 acres, adjoining the lands of Reuben Johnson, etc., be sold to the highest bidder, and the proceeds of said land be equally divided between my three grand-children, viz., Yancey Carter, son of my daughter Sarah Carter, Yancy King, son of my daughter Catharine King, and Yancey Russell, son of my daughter Elizabeth Russell.
Item 13. It is my desire that the personal property belonging to my estate shall be sold, and the proceeds of the said sale be equally divided between the bodily heirs of my three daughters, viz., Elizabeth Russell, Sarah Carter and Catharine King."
The tract of land on Rockhouse Creek was sold, and the money distributed as directed. The executor made sale of the entire personal property, besides the slaves, as directed by the 13th item of the will, amounting to $805, and also sold Harriet and her child Cina, as directed by the 11th item, for $1000. The slaves mentioned in the 10th item were hired out as therein directed.
Of the slaves loaned to Sarah Carter, as mentioned in the 8th item, one of them, Mary, was delivered of a female child, between the date of the will and the death of the testator. This child is named Nancy. The plaintiff asks the instruction of the Court whether this girl Nancy *Page 316 
is included in the legacy to Sarah Carter, or whether the same is undisposed of by the testator's will; and whether, if not included (381) in that legacy, this slave is to be sold under the 13th item of the will, and the proceeds divided among the children of Elizabeth Russell, Sarah Carter and Catharine King, or among all of the next of kin of the testator.
The advice of the Court is also asked as to the mode of distributing the fund raised under the 13th item; whether the children of Sarah Carter, Catharine King and Elizabeth Russell, are to take this fund per stirpes orper capita; and whether the division may be made in the life-time of the mothers, or must be postponed until their deaths.
Besides the personal property which came into the hands of the executor, there were received by him bonds and accounts to considerable amount; and he submits whether the money raised from these sources shall be distributed under the said 13th item, among the children of the three daughters, or to the entire next of kin.
He asks also to be informed as to the nature of his duties in the mode of disposing of the hires of the slaves, for the benefit of Mrs. Russell's children in Alabama. The nature of this enquiry is clearly stated in the opinion of the Court upon this point.
He also asks the instruction of the Court as to his duty in assenting to the legacies to Mrs. Carter and Mrs. King, under the 8th and 9th items of the will; whether they take the absolute property in the slaves mentioned in these items, thus making it proper to assent without qualification, or whether there be a limitation over to their children, and if so, in what manner he is to assent to the life-interest of the mothers.
Some years before the death of the testator, he made a parol gift, and delivered to his son Thornton the slaves Lucy and her four children, Missouri, Jinny, Norman and Cicero, and Jordan. Thornton took these slaves to Georgia, where he resides, and where he still has them. Some years before his death, the testator also gave, by parol and delivered to his son Archer, the slaves Sylvia and her four children, Calvin, Bill, Alfred and Joshua, also Henry, who took them to Mississippi (382) and sold them. Afterwards, in the life-time of the testator, Archer Holman died without leaving children. By reference to the 6th and 7th items of the will, it will be seen that the slaves given formerly to Thornton are bequeathed to Archer, and vice versa, those heretofore given to Archer are bequeathed to Thornton, which, the executor believes, was a mistake in the testator, the name of Thornton being used in the 6th item where it was intended Archer's name should be used; and the name of Archer being used in the 7th item, where it was intended that Thorton's name should be; and he believes that the *Page 317 
mistake was that of the draftsman; but he asks the advice of the Court in relation to these bequests; whether he is to treat them literally, as written in the will, or whether the Court will authorize him to pursue what he believes was the testator's intention in the premises. Also, whether the bequest to Archer failed by his death in the life-time of the testator.
Answers were filed by Thomas Carter and wife, and by the guardian of the infant next of kin, and judgments pro confesso were entered as to all the rest of the next of kin, they having been made parties to the bill. Replication to the answers.
The cause was set down for hearing on the bill, answers, former orders and exhibits, and sent to this Court by consent.
The bill is filed by an executor to procure from the Court a construction of the will of Yancy Holman.
We shall take up the items of the will in the order in which they were so lucidly arranged by the counsel of the plaintiff.
The 6th and 7th items of the will are so connected by the facts, that it is necessary to consider them together. We do not entirely concur in the view taken by the plaintiff's counsel as to these items. The authorities cited by him, to wit, Adams' Eq. 172; Yates v. Cole,54 N.C. 110, sustain his argument, that the names of Thornton and (383) Archer cannot be transferred from the respective items in which they are used, each to the other. There is, upon the face of this will no ambiguity; but there is an ambiguity arising out of extrinsic facts, and therefore, parol evidence is allowed to explain it. Yancy Holman, the testator, had some years before the making of his will, given by parol to his son Thornton Holman, the negro woman Lucy and her four children, Missouri, Jinny, Norman, and Cicero; and to his son Archer, he had given, in the same way, the negro woman Sylvia and her four children, Calvin, Bill, Alfred and Joshua. In his will he just reversed them, bequeathing to Thornton and negroes formerly given to Archer, and to the latter the negroes formerly given to Thornton. When these facts are known, (and they are admitted,) it is at once manifest, that a mistake was committed in the names of the respective legatees, or in the names of the negroes, as given by the will. No reason has been assigned, nor can we imagine one, for this change of names in the will. If the will is to receive a literal construction, Thornton loses the slaves originally given to him, and gets nothing by bequest, for he gets nothing *Page 318 
by the 12th and 13th items of the will; the proceeds of the sale of the slaves therein mentioned, being given specially to other legatees. Now, it is evident, it was not the intention of the testator thus to exclude Thornton from all interest in his estate, and we think there is enough on the face of the bequests to Thornton and Archer, to show that it was the intention of the testator to confirm to them his previous gifts. It is a general rule, that where the name or description of a legatee is erroneous, and there is reasonable doubt as to the person intended to be named or described, the mistake will not disappoint the bequest. The error may be rectified, and the true intent ascertained in two ways: 1st, by the context; and in some cases by parol testimony; thus, an error in the name of the legatee, may be obviated by the accessary [accessory] of his description; as where a legacy is given "to my name-sake Thomas, second son of my brother," and the brother had no son (384) named "Thomas," but his second son is named William, the latter will take. Williams on Ex'rs. 736. In the construction of a will, the Court may enquire into every material fact relating to the person claiming an interest under the will. Both the 6th and 7th items close in the same way, by a reference to previous gifts of slaves both to Thornton and Archer. It is true, that in grammatical construction, a relative is always applied to the next antecedent, and in these bequests the relative "that," according to the rule, would apply to the negroes Henry and Jordan; but the Court, to carry out the obvious intentions of a testator, will, where necessary, disregard the technical rules of grammar, and give the relative a more distant antecedent. Williams on Ex'rs. 715. In this case, we consider the relative as referring, not only to the negroes Henry and Jordan, but to the previous provisions of the item as coupled with the slaves previously mentioned. This construction is the true one. Apply this principle to the bequests in question: the slaves are designated by two descriptions; one, the names of the slaves; the other, an act of notoriety performed by the testator some time before, to wit, the previous gifts. We have seen, that if a legatee receives in a will two descriptions, the one, most certainly and accurately designating the individual, will govern the construction. So, in the subject of the bequests. In this case, the subjects of the bequests are designated in two ways. Which shall we take as most indicative of the testator's intention? The one, certainly, the least liable to mistake. The testator might have forgotten which family of negroes he had given to Thornton, and which to Archer, but he could not have forgotten the facts of the previous gifts. We consider the previous gifts, as facts much more to be relied on than the names of the negroes; and that in the 6th item, it was the intention of the testator, to confirm the *Page 319 
previous gifts made to Thornton and Archer; and that the former is entitled to hold, under the will, the slaves Lucy and her four children, Missouri, Jinny, Norman and Cicero. The bill states, that Archer Holman carried the negroes, given by the previous gift to him, to Mississippi, and there sold them, and died before the testator. (385) The bequest to him is a satisfaction of the previous gift.
Mrs. Carter does not take a life-estate in Nancy, the offspring of Mary. She was born after the making of the will, and before the death of the testator. The word increase, is not coupled with future, she, therefore, did not pass to Mrs. Carter with her mother and the other children, but is included in the 13th item, and is to be sold. Cole v. Cole, 23 N.C. 460;Joiner v. Joiner, ante 68. Nor did she pass to the children of Mrs. Carter under the terms "bodily heirs." The rule in Shelly's case has no application. Allen v. Pass, 20 N.C. 77.
The 10th clause directs certain slaves, whose names are mentioned, "to be hired out in that neighborhood, until the youngest child of the testator's daughter Elizabeth Russell, arrives at age; and the hires in the mean time, as received by the executor, to be forwarded to the clerk's office of Lauderdale county, Alabama, and by the county court of said county, to be distributed equally between all the children of the said Elizabeth Russell, etc." Mrs. Russell and her children, we presume, lived in Lauderdale county, Alabama, and the distribution is to be made there. There are in Alabama no county courts, but they have, what is called a probate court, discharging some of the functions of our Courts of Pleas and Quarter Sessions; they have the appointment of guardians to infants, and a general superintendence over their estates. To this Court then, it is the duty of the executor to remit the hires of these negroes, and in so doing, he may pay the hires to a duly appointed agent of the court of probate, or may employ an agent of his own for that purpose.
The 13th item embraces the proceeds of the sale of the personal property, already made, to wit, $805, the proceeds of the sale of Harriet and her child Cina, the proceeds of the sale of Nancy and all the choses in possession not otherwise disposed of. This clause does not embrace the bonds, notes and open accounts, and money on hand at the time of the testator's death, for the reason that the testator directs a sale of the property embraced in it. They must be distributed under the statute of distributions, as they are not disposed of by (386) the will. Pippin v. Ellison, 34 N.C. 61.
The children of Elizabeth Russell, Sarah Carter and Catharine King, takeper stripes and not per capita; that is, the children of each of the sisters take the place of their parent. Davidson v. Dallas, 14 Ves. Rep. 576, 2 Fearne 92; Hill v. Spruill, 39 N.C. 244. *Page 320 
Finally, the executor may distribute among the children as soon as he pleases, and need not wait for the deaths of their mothers. They have no interest in the matter.
The executor has asked our direction as to his assent to the legacies. An unqualified assent by an executor to a bequest for life, vests the title in remainder. Where, however, there are outstanding debts or trusts to be performed by the executor, he has a right to give a special, and not a general, assent, and ought, in the latter case, to insist that an inventory of the property be filed by the life-tenant, and also take a bond, with sureties, for the forth-coming of the property when the life-estate falls in. Iredell's Ex'r. 257; Saunders v. Gatlin, 21 N.C. 86; Cheshire v.Cheshire, 19 N.C. 254.
Per curiam.
Decree accordingly.
Cited: Miller v. Cherry, 56 N.C. 30; Lea v. Brown, 56 N.C. 150;Lockhart v. Lockhart, 56 N.C. 206; Young v. Young, 56 N.C. 220; Reddingv. Allen, 56 N.C. 369; Williams v. Cotten, 56 N.C. 394; Roper v. Roper,58 N.C. 17; Burgin v. Patton, 58 N.C. 427; Lee v. Baird, 132 N.C. 766;Carroll v. Mfg. Co., 180 N.C. 368; Mitchell v. Parks, 180 N.C. 635;Wooten v. Outland, 226 N.C. 248.